IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| WILLIE LEE STARKS, JR., <br><br> Plaintiff, <br><br> v. <br><br> SAFETY HOLDINGS, INC. d/b/a/ SAMBASAFETY, <br><br> Defendant. | Case No.: 3:25-cv-09892-MGL <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Willie Lee Starks, Jr. ("Plaintiff" or "Mr. Starks") by and through his counsel brings the following Complaint against Safety Holdings, Inc. d/b/a SambaSafety ("Defendant" or "SambaSafety") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report, specifically a Driver Record Report, that Defendant published to Plaintiff's employer Uber, which falsely portrayed that Plaintiff's standard driver's license was invalid, making him ineligible work for Uber as a driver.

## INTRODUCTION

1.    This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.    Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

1

3. Defendant falsely reported to Plaintiff's employer Uber that Plaintiff's standard, non-commercial, driver's license was invalid by reporting "None" under Plaintiff's driver's license status. Defendant's reporting is grossly inaccurate and untrue.

4. Defendant also reported "DRIVER NOT ELIGIBLE FOR DRIVING" about Plaintiff.

5. Plaintiff's driver's license was and is still in fact valid and he was and is eligible to drive a passenger car.

6. Uber suspended/deactivated Plaintiff's Uber account after receiving an employment background check report from Defendant, which erroneously showed that Plaintiff did not have an active, valid driver's license.

7. Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available Department of Motor Vehicle ("DMV") records from South Carolina regarding Plaintiff's driver's license status prior to publishing Plaintiff's report to his Uber.

8. Had Defendant performed even a cursory review of the South Carolina DMV records, it would have discovered that Plaintiff driver's license was never invalid. Rather, it was Plaintiff's Commercial Driver's License ("CDL") that was no longer active because Plaintiff's required medical certificate had expired. A CDL is not required when working for Uber as a driver.

9. Although Plaintiff's commercial driving privileges expired, his standard driving privileges did not expire or lapse at any point in time.

10. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

11. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their employers with inaccurate DMV record information.

12. Defendant's inaccurate report cost Plaintiff a good paying, flexible job and job security.

13. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

14. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA, and for failing to conduct a reasonable reinvestigation to determine whether the information Plaintiff disputed – the **"None"** or otherwise invalid status of his standard driver's license – was inaccurate and should be corrected in the subject consumer report, in violation of the FCRA, 15 U.S.C. § 1681i.

## PARTIES

15. Willie Lee Starks Jr. ("Plaintiff" or "Mr. Starks") is a natural person residing in Columbia, South Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16. Defendant Safety Holdings Inc., d/b/a SambaSafety ("Defendant" or "SambaSafety") is a Delaware corporation doing business throughout the United States, including

the State of South Carolina and in this District, and has a principal place of business located at 100 Sun Ave NE, Ste 650, Albuquerque, NM 87109 And can be served at its registered agent at C T Corporation System, 206 S Coronado Ave, Espanola, NM 87532.

17. Among other things, Defendant sells background checks, including Driver Record Reports to employers/prospective employers, such as Uber, for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer/prospective employer.

18. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

21. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such

as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

22. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

23. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

24. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

**THE FCRA'S PROTECTIONS FOR JOB APPLICANTS**

25. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

26. The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

27. In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

5

28. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

29. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

30. Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

**DEFENDANT'S ILLEGAL BUSINESS PRACTICES**

31. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

32. As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

33. The criminal background check industry takes in revenues in excess of three billion dollars, annually.

34. Background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating background checks.

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019),
https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf
("CFPB Report").

35. Background check companies, like Defendant, collect countless motor vehicle records ("MVR") from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

36. Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

37. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

38. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

39. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

40. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting "None" under Plaintiff's driver's license status or otherwise reporting Plaintiff's driver's license as invalid when his driver's license was in fact valid.

41. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS
**Plaintiff's Employment with Uber**

42.     In or around 2017 Plaintiff retired from the South Carolina Department of Corrections.

43.     In or around March 2016, Plaintiff began driving for Uber to supplement his income, which became more critical when he retired in 2017.

44.     For over eight years, Plaintiff's employment with Uber has been consistent and uninterrupted.

45.     Working exclusively for Uber, Plaintiff is able to meet his financial needs. Not only that but working for Uber also allows Plaintiff to dictate his schedule, flexibility that he views as an invaluable perk.

46.     Due to the nature of Plaintiff's employment for Uber, it is Uber's standard procedure to conduct periodic background checks on its employees to ensure its employees' driving records continue to be in good standing.

47.     During the eight years of Plaintiff's employment, Plaintiff was subject to Uber's periodic background checks on a regular basis, none of which caused Plaintiff any issues concerning his employment with Uber.

**Defendant Published an Inaccurate Background Check Report to Uber**

48.     Uber contracted with Defendant to conduct background checks, including motor vehicle and driving history checks, on its prospective and current employees including current drivers listed on the Uber platform.

49.     On or about December 6, 2024, Uber ordered a Driver Record Report ("consumer report") on Plaintiff from Defendant.

50. On the same day, December 6, 2024, in accordance with its standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to Uber.

51. Within that consumer report, Defendant published inaccurate information about Plaintiff.

52. Specifically, Defendant's consumer report about Plaintiff erroneously included information showing "None" under Plaintiff's driver's license status or otherwise reporting Plaintiff's driver's license as invalid, and was even scored **"Driver is not eligible for driving"** which appeared in the consumer report as follows:

```
DRIVER IS NOT ELIGIBLE FOR DRIVING
------------------------

ORIG.ISSUED   ISSUED      EXPIRES     CLASS               STATUS
-----------   ----------  ----------  -----               ------
03/10/1994    09/07/2021  03/17/2029  A                   NONE
```

53. The "None" status of Plaintiff's driver's license reported by Defendant about Plaintiff is inaccurate and otherwise states that Plaintiff's driver's license is invalid.

54. Plaintiff had, and currently has, an active, valid driver's license.

55. A cursory review of the widely available South Carolina Department of Motor Vehicle ("DMV") records confirms that Plaintiff's driver's license was never invalid. Rather, the DMV record confirms that only Plaintiff's CDL medical records were expired (a CDL is not required to work on the Uber platform as an Uber driver), his CDL was "Eligible," and his standard driver's license was listed as "No Suspension."

```
Status - DL: NO SUSPENSION       CDL: ELIGIBLE              MED: EXPIRED
```

56. However, Defendant reported that Plaintiff was "NOT ELIGIBLE FOR DRIVING" any vehicle.

57. The sole reason the inaccurate driver license status was reported on the consumer report concerning Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Uber.

58. Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's driver's license was never invalid and would not have reported the same.

59. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Uber inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Uber Deactivates/Suspends Plaintiff's Account and Plaintiff's First Dispute to Defendant**

60. On or about December 6, 2024, Plaintiff was notified by Uber via email that his Uber account will be deactivated on the subject consumer report provided by Defendant.

61. Plaintiff was confused by the email he received from Uber as Plaintiff has a perfect driving record and has never had issues with a consumer report for Uber in the past eight years of driving for Uber. Moreover, the email from Uber did not specify any reason for his deactivation.

62. The email stated "The specific records that will disqualify you from using the app for Rideshare requests are:" with the space of where the records should be left blank.

> Enclosed is a copy of your background check report you authorized us to order from Safety Holdings, LLC.
>
> The specific records that will disqualify you from using the Uber app for Rideshare requests are:
>
> If you believe that any of the information is inaccurate or incomplete, please contact Safety Holdings, LLC within 7 days of receiving this notice.

63. Upon Plaintiff learning that his uber account was suspended, Plaintiff contacted Uber multiple times throughout December 2024, primarily via Uber's support chat as Plaintiff failed to get a hold of Uber support through the phone. Uber informed Plaintiff that he needed to resolve the issue with Defendant.

64. Thereafter, upon information and belief, on or about December 16, 2024, Plaintiff disputed the inaccurate information of the "None" or otherwise invalid driver's license status with Defendant ("December 2024 dispute").

65. On or about December 21, 2024, Plaintiff received another email from Uber confirming that Plaintiff's Uber account was definitively deactivated direct result of the "None" or otherwise invalid status of Plaintiff's driver's license reported by Defendant.

66. Plaintiff was very panicked, confused, and concerned about the impact of the inaccurate reporting that his driver's license was invalid and he is ineligible to drive, both in relation to his employment with Uber, but also the impact of the same on his future.

67. Specifically, Defendant reported Plaintiff was ineligible to drive and reported his driver's license status with a "None" or otherwise invalid status that is clearly labeled in the underlying DMV records as a valid. The underlying DMV records were available to Defendant

11

prior to publishing Plaintiff's consumer report to Uber, but Defendant failed to obtain or perform even a cursory review of such information.

68. On or about December 27, 2024, Plaintiff even obtained a copy of his South Carolina driving history report from the DMV to verify that there was not any suspensions or other information he was not aware about.

69. Upon Plaintiff's review of the driving history report, the word or status "None" was nowhere to be found on the report.

**Plaintiff's Second Dispute of the Misinformation in Defendant's Consumer Report**

70. On January 1, 2025, desperate to resecure employment with Uber and riddled with worry over the far-reaching impacts of the inaccurate information especially after not receiving any correspondence from Defendant in regard to Plaintiff's December 2024 dispute, Plaintiff disputed the inaccurate information with Defendant again. Plaintiff disputed via Defendants online portal ("January 2025 dispute").

71. Plaintiff identified himself and provided information to Defendant to support his dispute including a copy of the driving history report he obtained from the South Carolina DMV.

72. Plaintiff specifically disputed the "None" or otherwise invalid driver's license status. Plaintiff explained that his CDL privileges were expired, but his standard, non-commercial driver's license was still active and valid.

73. Plaintiff specifically asked Defendant to investigate and correct its reporting in any consumer report about Plaintiff.

**Defendant Failed to Conduct a Reasonable Reinvestigation and Correct the Consumer Report**

74. On or about January 9, 2025, Plaintiff received Defendant's correspondence via email regarding Plaintiff's December 2024 dispute with the subject line in Defendant's correspondence email saying, "Willie Lee Starks Jr – Dispute – 2024-12-16". Defendant stated that it had received Plaintiff's dispute regarding the consumer report sold to Uber, but it had processed Plaintiff's dispute as a request for Defendant to run a new report on him & instructed Plaintiff to contact Uber to request a new report.

75. Essentially, Defendant refused to investigate Plaintiff's December 2024 dispute.

76. Furthermore, Plaintiff never received Defendant's correspondence regarding his January 2025 dispute.

77. Upon information and belief, Defendant failed to investigate Plaintiff's December 2024 or January 2025 disputes.

78. Defendant failed to issue a corrected consumer report to Uber.

**Defendant Published an Inaccurate Background Check Report to Uber Again**

79. Plaintiff continued to communicate with Uber via chat throughout February 2025 a handful of times. In these communications Plaintiff asked Uber to request a new report about him or otherwise rectify the issue and reactivate Plaintiff's Uber account.

80. On or about February 5, 2025, Uber ordered a new report from Defendant about Plaintiff.

81. On the same day, February 5, 2025, in accordance with its standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to Uber.

82. Within that consumer report, Defendant published inaccurate information about Plaintiff once **again** which erroneously included the same information from Plaintiff's initial consumer report ordered by Uber in December 2024.

13

83. Specifically, Defendant's second consumer report about Plaintiff was showing "None" under Plaintiff's driver's license status or otherwise reporting Plaintiff's driver's license as invalid and was again scored "DRIVER IS NOT ELIGIBLE FOR DRIVING."

84. The "None" status of Plaintiff's driver's license reported by Defendant about Plaintiff is inaccurate and otherwise states that Plaintiff's driver's license is invalid.

85. Plaintiff was and is eligible to drive. Plaintiff had, and currently has, an active, valid driver's license.

86. On February 6, 2025, because of Plaintiff's frustration concerning his employment struggles with Uber due to Defendant's inaccurate reporting, Plaintiff went as far as obtaining his medical certificate and renewed his CDL privileges even though he had no use for it, all in hopes that it would help correct Defendant's reporting.

87. Shortly thereafter, Plaintiff re-submitted his license to Uber at least three times between February 6, 2025, and April 2025, still hoping his efforts would push Uber in requesting a new report from Defendant.

88. On or about April 10, 2025, Plaintiff contacted Uber customer support again to inquire about the status of his consumer report as he was still deactivated from the Uber platform.

89. The Uber representative could not tell Plaintiff when or if a new report had been requested from Defendant.

90. During Plaintiff's communication with Uber on April 10, 2025, the Uber representative stated, "based on the results of your background check from our third-party vendor, Samba Safety, the driver's license provided is not valid."

91. A cursory review of the widely available DMV records confirms that Plaintiff's driver's license was never invalid. Rather, the DMV record confirms that only Plaintiff's CDL was invalid, which is not required to work on the Uber platform as an Uber driver.

92. The sole reason the inaccurate "None" driver license status was reported on the second consumer report concerning Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Uber.

93. Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's driver's license was never invalid and would not have reported the same.

94. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Uber inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

95. Despite Plaintiff's disputes, Defendant failed to conduct a reasonable reinvestigation of Plaintiff's December 2024 and January 2025 disputes and failed to correct the disputed information in violation of 15 U.S.C. § 1681i(a)(1)(A).

96. Because Defendant failed to issue a corrected consumer report, Uber did not reactivate Plaintiff's account on the Platform therefore continuing to leave Plaintiff ineligible to drive for Uber.

97. But for Defendant's inaccurate consumer report, Plaintiff's Uber account would have been reactivated, and Plaintiff would have been spared the humiliation, embarrassment, and stress imposed upon Plaintiff to correct Defendant's erroneous reporting.

98. Defendant's false report cost Plaintiff a promising, well-paying, and flexible job with Uber.

99. Moreover, while working exclusively for Uber, Plaintiff was able to meet his financial needs. Not only that but working for Uber also allowed Plaintiff to dictate his schedule, flexibility that he views as invaluable. While driving for Uber, Plaintiff would earn on average up to $5,000 per month and up to $10,000 per month during certain times of the year. More importantly, Plaintiff was excited to continue driving for Uber because he was qualified to successfully perform the work given his employment history as a CDL driver and wanted to use the job with Uber to save money to purchase a new car so his vehicle can stay up to date with Uber's policy.

100. Plaintiff also wanted to use the job with Uber to support his family and take his wife on a vacation for their wedding anniversary, but Defendant's inaccurate reporting's made it impossible for Plaintiff to regain access to the Uber platform, and has since left Plaintiff and his wife living paycheck to paycheck off of their minimal benefits.

101. Due to Defendant's unreasonable procedures and shoddy, if any, dispute reinvestigation, and despite Plaintiff's continued efforts to seek employment, Plaintiff has been unemployed for approximately **seven months**, from December 2024 to July 2025.

102. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

103. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

104. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

105. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

106. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

107. At all times pertinent hereto, the above-mentioned consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

108. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

109. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time

and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

110. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

111. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

112. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

113. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

114. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

115. On at least two occasions between 2024 and 2025, Plaintiff disputed the inaccurate information with Defendant and requested that Defendant correct the inaccurate information in the consumer report that is patently inaccurate, misleading, and highly damaging to him, namely, stating that his driver's license is invalid and that he is not eligible to drive.

116. In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in the consumer report and refused to correct the consumer report at issue.

117. Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to correct the disputed inaccurate information from the subject consumer report; by failing to follow reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a public source it has reason to know is unreliable.

118. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

119. Defendant willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

120.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendant negligently and/or willfully violated the FCRA;

ii.  Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 6th day of August 2025.

*/s/ Dawn McCraw*
Dawn McCraw (SCB #105059)
Consumer Justice Law Firm, PLC
8095 N 85th Way
Scottsdale, AZ 85258
T: (602) 807-1527
F: (480) 613-7733
E: dmccraw@consumerjustice.com

*Attorneys for Plaintiff*
*Willie Lee Starks, Jr.*

20